Trousdale *v.* Thomas.

## C. W. Trousdale, Adm'r, *v.* H. H. Thomas *et als.*

**1. Pleading.** *Amendment of declaration. Statute of Limitations.* Where the action was in detinue and the declaration in trover, it is not reversible error in the trial court to refuse an application by the plaintiff to amend his declaration by a count on the facts of the case for neglect, upon the objection of the defendants that the new cause of action was barred by the statute of limitations.

**2. Evidence.** *Affidavits.* If the defendant offer as evidence the affidavits of the plaintiff, in relation to the demands in suit, for the purpose of having the benefit of the plaintiff's receipts of other demands written

on, and expressly referring to the affidavits for the description of the demands for which the receipts were given, it is not error to charge that the affidavits were not evidence of the truth of their contents, but only evidence of the fact that the plaintiffs made the claims therein set forth.

3. BANK OF TENNESSEE. *Seizure by military authorities. Appointment of agents, by the State officers, to examine assets of the Bank, under act of the Legislature, not conversion.* The States of Tennessee and Georgia were, in the spring of 1865, so far in a state of war that the seizure by the military authorities of the United States of the effects held by the officers of the Bank of Tennessee deprived those officers of all control over the same, and vested the executive officers of the State of Tennessee, to whom the military authorities surrendered the effects for the State, with authority to safely keep them until the Legislature should direct what disposition should be made of them, and the possession of the State officers afterwards under an order of the Legislature to take charge of and examine the effects, and the employment of agents to make an examination and schedule thereof, under an act of the Legislature, would not be a conversion, either in the State officials or the agents. And an order by the Legislature to take charge of and examine the assets of the Bank of Tennessee, would include special deposits.

FROM DAVIDSON.

Appeal in error from the Circuit Court of Davidson county. N. BAXTER, J.

J. C. GUILD and BAXTER SMITH for Trousdale.

N. S. BROWN for Thomas *et als.*

COOPER, J., delivered the opinion of the court.

In February, 1862, in view of the expected entrance of the Federal army into Nashville, the Bank of Tennessee removed the contents of its vaults, including the special deposits of individuals, to the south. In the month of May, 1865, the effects thus removed

were seized by the commanding officer of the Federal troops in the State of Georgia, and, after some correspondence with Wm. G. Brownlow, the then Governor of this State, brought to Nashville, and, under the orders of the Federal General commanding, delivered to the Governor, Comptroller and Secretary of State, who personally received them, and caused them to be carried to the State Capitol and deposited in a room guarded by soldiers furnished by the Federal General. The Legislature of the State was then in session at the Capitol, and a resolution was at once introduced into that body and passed a few days thereafter, instructing the Governor, Secretary of State and Comptroller to take charge of these effects. On the 9th of the following month, the Legislature passed an act directing the Governor, Secretary of State and Comptroller "to employ such agencies as they may deem necessary for the purpose, to investigate into the assets of the Bank of Tennessee, and to ascertain and schedule the amount and value thereof." Under this act, each of these officers selected an agent to examine the effects which had been received, and schedule the same. These agents did together make the examination and inventory, which inventory was submitted by the Governor to the Legislature and ordered to be printed by that body. Afterwards, by act of the Legislature, passed in 1866, the effects were directed to be turned over to the newly appointed President and Directors of the Bank of Tennessee, and this was done in March, 1866. On the 11th of April, 1866, Eli Odom, plaintiff's intestate, presented to the President of the

Bank an affidavit that in 1861, he had made a special deposit in the Bank of Tennessee of a tin case containing 103 bonds of the county of Sumner, of $1,000 each, and five bonds of the same county of $100 each, all issued to the Louisville and Nashville Railroad Company; also of an envelope containg three bonds of the same county of $1,000 each; also of the same or different envelope, containing three State bonds for $1,000 each, of the issue of 1861. At the foot of this affidavit, on the 18th of April, 1866, he gave the Bank of Tennessee a receipt for the tin case containing the 103 bonds "described in the foregoing affidavit," also three bonds of $100 each, "the latter being Sumner county bonds." On the 30th of May, 1866, Odom made another affidavit, that in 1859, he had deposited in the Bank a tin case containing 103 bonds of $1,000 each, and three $100 bonds, "and an envelope containing three $1,000 Sumner county bonds, and 5 eight per cent. Tennessee State bonds, issued in June, 1861. The affidavit admitted the previous receipts of his tin case and its contents "as deposited." On the 31st of May, 1866, Odom gave, on the back of the affidavit, a receipt to the Bank of Tennessee for four of the State bonds "described in the affidavit," and on the 30th of July, 1866, a receipt for the fifth bond. On the 2d of December, 1869, he instituted this action of detinue for the three Sumner county bonds for $1,000 each, claimed by his affidavits to have been deposited in the Bank in an envelope. The suit was against Wm. G. Brownlow, S. W. Hatchett, E. E. Fletcher, Ex'r of A. J. Fletcher, de-

ceased, H. H. Thomas, Samuel Hunt, and Samuel Watson. Brownlow was the Governor of the State, Hatchett Comptroller, and A. J. Fletcher Secretary of State, when the assets of the Bank were turned over to the State authorities by the commander of the United States' army. Thomas and Hunt were two of the agents employed to examine and schedule the assets, and Watson was the new President of the Bank of Tennessee.

A declaration was filed in trover, to which the defendants pleaded not guilty. On the 26th of November, 1873, the plaintiff moved to amend his declaration by filing counts on the facts of the case, seeking to hold the defendants liable for negligence in safely keeping the bonds. The court refused the application, to which the plaintiff excepted. On the trial of the cause, the jury found a verdict for the defendants, and the plaintiff has appealed in error.

Before the trial, Odom died, and the suit was revived in the name of the plaintiff as his administrator. Evidence was introduced by him tending to show that his intestate had, in 1859 or 1860, deposited in the Bank of Tennessee, as a special deposit, a tin box containing 103 Sumner county bonds of $1,000 each, and a separate envelope containing three of the same bonds of $1,000 each. The printed schedule of the assets turned over to the State officers, shows one item as follows: " Tin case, containing 103 $1,000 bonds; also 3 $1,000 bonds, Louisville & Nashville R. Co., marked property of Eli Odom." The original schedule in writing is, however, produced and identified, which

described the three additional bonds as $100 bonds. The defendant Hatchett died before the trial, and before his evidence was taken, but the bill of exceptions contains the depositions or testimony of Brownlow, Thomas, Hunt, Watson and Hawkins, the last of whom was the third agent who examined the assets and made the schedule. The entire evidence leaves no reasonable ground to suppose that there was an actual conversion of the bonds sued for, by any of the defendants, either by appropriation to themselves or by delivery to others, or that such bonds ever came to the hands of either of the defendants. Under these circumstances, the record must show a very palpable error to justify the continuance of useless litigation by a reversal.

The first error relied on for reversal, is in the refusal of the Circuit Judge to allow the plaintiff to amend his declaration, upon the application made on the 26th of November, 1873. The practice in this State always has been to allow amendments at any stage of the cause, with a view to attain the ends of justice, when it can be done without prejudice to the opposite party; and the statutes, brought forward into the Code, section 2867, were only a legislative endorsement of the practice. *Beard* v. *Young*, 2 Tenn., 54. The same construction has been put upon the statute as upon the previous practice, that the amendments authorized are to promote the ends of justice, not to operate prejudicially to the opposing party. *Smith* v. *Large*, 1 Heis., 5. Accordingly, in a case where the time of the commencement of the action became important

in reference to the statute of limitations, the effect of an amendment changing the form of action was restricted to the time when the amendment was actually allowed, and the statute held to be a good defense. *Crofford* v. *Cothran,* 2 Sneed, 492. There are a number of cases in accord on the general principle. *Miller* v. *Taylor,* 6 Heis., 481 *Flatley* v. *Memphis & Charleston R. R. Co.,* 9 Heis., 235; *Lillard* v. *Porter,* 2 Head, 179. If, therefore, the amendment had been allowed in this case, the statute of limitations would have been a good defense to the new action, and the refusal of the Judge to allow the amendment cannot be treated otherwise than as a sound exercise of discretion.

The Circuit Judge charged the jury that the affidavits of Odom, which were introduced by the defendants, were not evidence of the truth of their contents, but merely evidence of the fact that he made the claims therein set forth. It is now insisted that the plaintiff was entitled to the benefit of these affidavits, as evidence to be looked at by the jury and weighed as other evidence.

If the affidavits had been introduced by the defendants as admissions made by the plaintiff, the rule contended for would apply. But it is clear they were only offered for the purpose of enabling the defendants to have the benefit of the plaintiff's receipts, which expressly refer to the affidavits for the description of the bonds received. In this view, the charge of the Judge was correct.

It is earnestly argued that the President of the Bank at the time of the removal of its effects south,

46—VOL. 3.

who continued to act as president until their seizure by the military forces, and who came back on the same train with the property, was the proper custodian, and the possession of the defendants unauthorized and a conversion. And in this connection, the Circuit Judge is charged with error in assuming as a fact, that in April, 1865, the States of Georgia and Tennessee were in a state of war, by reason of which fact the military seizure was operative. The argument is, that in this State at any rate there was a resumption of civil government. If this be conceded, the seizure was in Georgia, where military law alone prevailed. And even in this State, the effort to reinstate the State government was under the direction of the President of the United States as commander-in-chief of the armies of the United States. And it was not until long afterwards that the proclamation of the President restored this State and its citizens to their normal condition. The seizure or capture of the effects by the military, put an end to the control of the existing President of the Bank, and although he may have accompanied them on their return, the proof is clear that it was as a volunteer, not as one in authority.

The entire effects held by the officers of the Bank were treated by the military as captured property, and if, under these circumstances, these effects were turned over to the State of Tennessee through its highest executive officers, the officers would be clearly justified, as the Circuit Judge charged, in safely keeping them until the Legislature should direct what disposition

should be made of them. The delivery to the officers was for the State, and the State could authoritatively speak only through its Legislature. What would have been the effect of a willful refusal of the Legislature to act, or to act in a reasonable time, we need not stop to inquire, for the Legislature did act in a reasonable time, and in a just manner, and the plaintiff's intestate received, it is almost certain, all of his property which was actually received by the State from the military.

It is said that the resolution of the Legislature only authorized the Governor, Secretary of State and Comptroller to take charge of the assets of the Bank of Tennessee, and the act of the Legislature only directed that they investigate such assets, and that this language would not include the special deposits of third persons. But this is entirely too narrow a view of the words used, and the intention disclosed. What was clearly meant by the assets, was the property captured by the military and proposed to be surrendered to the State. The plaintiff's intestate, and other special depositors, would have had a just right to complain if the State officers had declined to receive anything except what belonged to the Bank.

Neither simple asportation nor refusal to deliver on demand, necessarily establishes a conversion. Each is only *prima facie* evidence of conversion, and inoperative if it appear that there was really no intention to convert and no conversion. *Garvin* v. *Luttrell*, 10 Hum., 16; *Scruggs* v. *Davis*, 5 Sneed, 261. The officers of the State, in accepting the property of the

---

---

Bank from the military, who claimed it as lawful capture, were, under the circumstances, performing a public duty, and the act was not a conversion. They did not surrender the possession by employing agents to examine and make a schedule of the property. Nor were they guilty of a conversion by merely refusing to deliver special deposits upon demand, until. the Legislature had been advised of the facts, and. had a reasonable time to act. The Circuit Judge was, therefore, correct in giving the instructions which are chiefly complained of.

There is no error in the judgment, and it will be affirmed.